EHRHARDT et al., Appellants, v. STEVENSON, Respondent.

St. Louis Court of Appeals, November 18, 1907.

1. **PARTNERSHIP: Contract to Form Partnership: Liability of Prospective Partner.** Where three parties made an agreement that they would form a partnership which in fact was never formed, and work was done for the benefit of the three prospective partners by their direction and with the understanding it was to be at the expense of the partnership, they were all liable for the work so done.

2. **PRACTICE: Evidence: Stating the Evidence Expected.** It is error on the part of the trial court to refuse to permit counsel to state what evidence he expects to prove by a witness whose evidence is excluded.

3. ——: ——: **Confidential Communications.** An attorney as a witness cannot refuse to give testimony as to communications of his client to him on the ground that they are privileged, unless the client himself claims the privilege.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

REVERSED AND REMANDED.

*Earl M. Pirkey* for appellants.

*Daniel Dillon* for respondent.

BLAND, P. J.—In the fall of 1903, Thomas R. Pullis and Thomas G. Scott were looking for a house, in the city of St. Louis, for amusement purposes, with the view of producing winter circuses and other amusements during the Louisiana Purchase Exposition. They were discovered by the defendant, William Stevenson, making an examination of No. 3218 Olive street. Stevenson, inquired what their business was, and why they were

looking at the house. They informed him they were looking for a place to fit up for amusement purposes. After several consultations, under some kind of an arrangement with Stevenson, Pullis and Scott got possession of the house, and Pullis, in the name of the Auditorium Amusement Company, entered into a written contract with plaintiffs to furnish certain material and make certain repairs on the building, and also to do some painting, for which they were to be paid the sum of $462.60. The contract was signed, "Auditorium Amusement Company, by Pullis, Secretary and Treasurer." Pullis also guaranteed payment of the contract price. Plaintiffs furnished the material and did the work, but were not paid, and brought suit against Pullis and Scott, as partners, doing business in the name of the Auditorium Amusement Company, and recovered judgment, but the judgment has never been paid.

The present action was commenced before a justice of the peace and was, in due course, appealed to the circuit court, where on a trial *de novo* plaintiffs were forced to take a nonsuit. Their motion to set aside the nonsuit proved of no avail and they appealed to this court.

The ground upon which plaintiffs seek to hold defendant for the account sued upon, is that he was a partner with Pullis and Scott in the amusement enterprise. Plaintiffs proved the account and stated as an excuse for not making defendant a party to the suit against Pullis and Scott, that they did not know at that time he was a partner, and did not find it out until after judgment was rendered. Plaintiffs introduced Pullis as a witness, who testified in respect to the partnership, that several conferences were had by himself and Scott with defendant, in regard to the building and the amusement enterprise; that defendant told them he owned the building but had put the title in the Empire Building Company to protect it from his creditors. Witness also said: "We talked about the amusement feature, and we

submitted a plan, stating that we wanted to organize a corporate company or copartnership for amusement purposes, and we were looking at his building and he showed us through his building, took us through himself. . . . He said that he was perfectly willing to join in the transaction; that he owned the building; that he would give up possession of the building, and did give up possession of the building, and we went on with the enterprise." Witness further testified that the partnership was to be called the Auditorium Amusement Company which was afterwards done; that the agreement was that Scott, who was an old showman, was to contribute his time and experience to the partnership, that witness was to contribute $5,000 in cash and his time, and Stevenson was to contribute the use of the building free of rent to the partnership; and it was understood that witness was to act as secretary and treasurer of the company. He testified he was authorized to put the building in condition as a show building and that possession was delivered to him for that purpose; that he immediately proceeded to have the building renovated and put in order and made the contract with plaintiffs for the work they performed and for which the suit was brought; that it was agreed each partner should receive one-third of the profits realized from the show business. On cross-examination Pullis testified he never put a dollar in the partnership; that he failed to raise the money he expected to and the agreement was that the partnership should remain in abeyance until he raised the money. His evidence also shows he made a verbal contract with Stevenson to lease the property of the Empire Building Company, at a rental of $400 per month, and in a short time after making this contract he entered into a written contract with Stevenson, as the agent of the Empire Building Company, to purchase the property for $55,000. Pullis testified he failed to

pay rent, to pay the purchase price or any part of it, or to furnish the $5,000 he agreed to put in the partnership, and was, about January 1, 1904, forcibly ejected from the building by Stevenson. There is no other evidence in the record tending to prove a partnership was formed. The most favorable construction that can be reasonably given to Pullis' testimony, as a whole is that he, Scott and defendant, agreed to form a partnership to be known as the Auditorium Amusement Company for the purpose of giving shows at No. 3218 Olive street; that Scott was to contribute his experience and talent as a show man, Pullis was to contribute $5,000 in cash and his time to the show business, and Stevenson was to furnish the building rent free, but that this arrangement was to be held in abeyance; in other words, the agreement was not to become operative until Pullis should come forward with $5,000 cash. Pullis failed to raise the money, or any part of it, and hence the agreement, if ever made, to form a partnership was never effectuated and no-partnership, in fact, was ever formed. But the evidence of Pullis in chief, to the effect that after the terms of the contract had been agreed upon, he was put in possession of the premises by defendant and authorized by him to have the house renovated and fitted up for amusement purposes, was not shaken by his cross-examination, nor contradicted by any evidence in the record. On this evidence, notwithstanding the contract of partnership was, as between the parties thereto, held in abeyance, the parties to the contract were liable for such work as Pullis contracted to have done for the renovation of the house, for the work was not done for Pullis alone, but for the benefit of the three parties to the contract of partnership and by their direction and with the understanding that it was at the expense of the partnership.

2. Clinton L. Caldwell, an attorney at law, who testified he had been defendant's attorney from 1901 to

August, 1905, swore, without objection, that he had several conversations with defendant about the property and its sale to Pullis, and about the Amusement Company, but that defendant told him nothing about the partnership. In his examination the following took place:

"Mr. Pirkey: When did you quit acting as attorney for Mr. Stevenson? A. In August, 1905.

"Q. Well, after this work was done, this painting and work on that building, did Mr. Stevenson have any conversation with you in regard to it?

"Mr. Dillon: I object. That doesn't grow out of the cross-examination. It is part of the examination in chief, certainly, if it is any part at all.

"The Court: It is part of the examination in chief, if at all; but if counsel has omitted it for any reason, he may ask it.

"Mr. Pirkey: Yes, sir, I want to take that up now.

"(Question read.)

"The Court: I don't remember that having been asked him before. You may ask the question.

"A. Yes, sir.

"Mr. Pirkey: What did he say in that conversation?

"Mr. Dillon: I object to opening up this whole case again.

"The Court: Well, if the objection is put upon the ground, Judge, that it is merely permitting him to open that branch of the case again, it will be overruled, giving you an opportunity, of course, to cross-examine.

"Mr. Pirkey: Answer the question.

"(Question read.)

"A. I take it that is a privileged communication, and I decline to answer it, with all due respect to the court.

"Mr. Dillon: We make the objection on behalf

of Mr. Stevenson that it is a privileged communication between attorney and client.

"Objection sustained. To which ruling of the court plaintiffs then and there duly excepted.

"Mr. Pirkey: Did he say anything to you in regard to what he would do about paying the bill at the time the work was being done?

"Same objection and ruling. To which ruling of the court plaintiffs then and there duly excepted."

Plaintiffs attempted to make an offer of what they expected to prove by the witness. In view of Pullis' evidence in respect to defendant's statements to him about the ownership of the property, and the circumstances under which the work was done by plaintiffs, we think it was competent to show, as a matter of fact, that defendant was the true owner of the property; and also his statements, if against his interest in regard to the work being done on the building. What the witness would have testified in regard to these matters is not in the record for the reason the court refused to permit plaintiffs to state what they expected to prove. This was error; and it was error to exclude the evidence on the ground that the communications were confidential. The witness, at the threshold, disclosed his relations to Stevenson and claimed Stevenson's communications were privileged because made to witness as his attorney. The court properly ruled that it was for Stevenson, not his attorney, to claim the privilege. Stevenson declined to make the claim, and Caldwell's examination and cross-examination, covering ten pages of the printed record, proceeded before the objection was made. The general rule is, that the right to object to any witness as incompetent is waived unless the objection is taken at the first opportunity. A party cannot take the benefit of the evidence of an incompetent witness and at the same time object to evidence that is against

128 App.—31

him on the ground of his incompetency.    [Imboden v. Trust Co., 111 Mo. App. 1. c. 323, 86 S. W. 263, and cases cited.]

For errors noted the judgment is reversed and the cause remanded.   All concur.